**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| STEVEN DIAS and RAYMOND IGLE | : | |
| Plaintiffs, | : | |
| v. | : | C.A. No. 04-379T |
| WAL-MART STORES, INC. | : | |
| Defendant. | : | |

**WAL-MART STORES, INC.'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, Defendant Wal-Mart Stores, Inc. ("Wal-Mart") hereby moves for summary judgment on all counts in the Complaint filed by Steven Dias.[1] The facts and arguments upon which this motion is based are set forth in the accompanying Affidavit of Alan Centazzo and the supporting memorandum of law.

Dated: Providence, Rhode Island
July 15, 2005

[1] On July 1, 2005, Plaintiff Raymond Igle agreed to dismiss his claims.

Respectfully submitted,

Defendant
WAL-MART STORES, INC.
By its attorneys,

GEOFFREY W. MILLSOM (#6483)
MICHAEL D. CHITTICK (#5967)
JAIME J. LAPORTE (#6668)
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel: (401) 274-7200
Fax: (401) 751-0604

CERTIFICATE OF SERVICE

I hereby certify that I am over 18 years of age and not a party to this action. On July 15, 2005, I caused the foregoing Motion for Summary Judgment to be served by first class mail, postage prepaid, upon the following:

Robert M. Novack, Esq.
Clarkin, Galvin, Lowenstein & Novack
Post Office Box 267
84 North Main Street
Fall River, MA 02720

*332593_1.doc*

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| STEVEN DIAS and<br>RAYMOND IGLE | : | |
| Plaintiffs, | : | |
| v. | : | C.A. No. 04-379T |
| WAL-MART STORES, INC. | : | |
| Defendant. | : | |

# MEMORANDUM OF LAW IN SUPPORT OF WAL-MART STORES, INC.'S MOTION FOR SUMMARY JUDGMENT

WAL-MART STORES, INC.
By its attorneys,

GEOFFREY W. MILLSOM (#6483)
MICHAEL D. CHITTICK (#5967)
JAIME J. LAPORTE (#6668)
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel: (401) 274-7200
Fax: (401) 751-0604
Dated: July 15, 2005

**TABLE OF CONTENTS**


INTRODUCTION....................................................................................3

DESCRIPTION OF MOTION....................................................................4

STATEMENT OF FACTS........................................................................5

A. Background....................................................................................5

B. The Pleadings.................................................................................7

C. The Evidence (Or Lack Thereof) Of Discrimination Or Pretext...............7

ISSUES................................................................................................8

POINTS AND AUTHORITIES..................................................................9

I. STANDARD OF REVIEW AND PLAINTIFF'S BURDEN OF PROOF.....9

II. DIAS CANNOT ESTABLISH A PRIMA FACIE CASE OF DISCRIMINATION.......................................................................12

III. DIAS CANNOT ESTABLISH THAT THE REDUCTION IN FORCE AND USE OF PERFORMANCE AS THE CRITERIA FOR HIS TERMINATION WERE A PRETEXT FOR DISCRIMINATION................................15

CONCLUSION......................................................................................18

Wal-Mart Stores, Inc. ("Wal-Mart") respectfully submits this memorandum of law in support of its motion for summary judgment on all counts set forth in the Complaint filed by Steven Dias.[1]

## INTRODUCTION

In this case, a former Wal-Mart employee alleges – without any basis – that he was terminated from the overnight stocking crew at the Newport Wal-Mart Store because he was black. The undisputed facts, however, reveal that he was terminated after the 2002 Christmas season as part of a race-neutral reduction in force. His former manager and Wal-Mart's personnel records reflect that both he and his former co-plaintiff were terminated based on their low productivity relative to the other overnight stockers. In fact, his former co-plaintiff candidly admitted his own poor productivity. Dias, naturally, denies that he was less productive than his colleagues. This denial, however, does not create a genuine issue of material fact that entitles him to put his claims in the hands of a jury.

In order to survive summary judgment, Dias must demonstrate that he can make out a case of discrimination at trial by coming forward and identifying admissible evidence that supports his allegations. He cannot make this showing with respect to two elements of his prima facie claim, because he is unable to show: (i) that he performed his job satisfactorily <u>and</u> (ii) that Wal-Mart was not race neutral in its decision to terminate him or to retain white employees. Nor can Dias prove – as he must – that Wal-Mart's legitimate, non-discriminatory reason for his termination was pretext for discrimination.

Particularly damning to Dias are the objective racial statistics of the employees on the overnight stocking crew in Wal-Mart's Newport store before and after the reduction

---

[1] Plaintiff Raymond Igle settled his claims against Wal-Mart at a mediation on July 1, 2005.

in force. These statistics show that of the 8 overnight stockers terminated in December 2002, 4 (including Dias) were black, 3 were white and 1 was Hispanic. These numbers do not suggest that termination decisions were made with any sort of racial bias, animus, or even consideration; if anything, the numbers suggest that the decisions to terminate were made without regard to race.

Dias claims that the evidence of discriminatory intent lies in the fact that several of the white employees who were retained after his termination had less job seniority than he. Leaving aside the fact that he has no seniority-based right to retain his job, again the objective statistics belie Dias' claim. Of the 14 employees with less seniority than Dias who were retained after his termination, 4 were white, and 9 were black. These undisputed (and indisputable) numbers simply refute Dias speculative theory of discrimination by Wal-Mart.

At the end of the day, Dias' evidence of discrimination consists of nothing more than his own self-serving testimony that Wal-Mart based its decision to terminate him on his race. This is not enough, as a matter of law, to survive summary judgment. The lack of any colorable or admissible evidence of discrimination, combined with the undisputed facts compel the issuance of summary judgment in favor of Wal-Mart.

## DESCRIPTION OF MOTION

Wal-Mart respectfully requests that this Court grant its motion for summary judgment as to all claims asserted by Plaintiff Steven Dias. As set forth in greater detail below, Dias cannot establish a prima facie case of racial discrimination under Title VII or the FEPA, nor can he offer any evidence to establish that Wal-Mart's legitimate, non-discriminatory reason for his termination was a pretext for racial discrimination.

## STATEMENT OF FACTS

A. Background

Dias is a former employee at the Wal-Mart store located in Newport, Rhode Island. See Exit Interview Form attached as Exhibit 1. Dias was hired at the Newport Wal-Mart on or about August 2001 and immediately took a position as an overnight stocker. See Steven Dias Deposition Transcript ("Dias Dep. Tr.") at 10-11, attached as Exhibit 2. Dias' formal performance evaluations indicated that Dias generally met the expectations of management, but had areas in which he needed to improve. For example, on his November 2001 performance evaluation, management specifically indicated that Dias needed to be "more aggressive" and to increase the number of boxes stocked per hour. Dias was never commended for exemplary work performance. See Performance Evaluations attached as Exhibit 3. Id. As part of the November 2001 performance evaluation, Dias indicated that he would "try to have more of a sense of urgency." Id. In addition to the formal performance evaluations, one of the managers at the Wal-Mart Newport Store told Dias that he needed "to finish [his] area quicker." See Dias Dep. Tr. at 28.

In December 2001, the Newport Store Manager, David Bandy, informed his Assistant Manager assigned to the overnight stocking crew, William Silva, that it was necessary to reduce the number of employees who would be working on the overnight stocking crew after Christmas. See William Silva Deposition Transcript ("Silva Dep. Tr.") at 22-23, attached as Exhibit 4. Bandy provided Silva with Wal-Mart's non-binding Reduction in Force Guidelines to help assist in the process of terminating the appropriate employees. See Silva Dep. Tr. at 20-21. According to the Reduction in Force

Guidelines, employees should generally be terminated in the following order: (1) temporary employees; (2) employees with below standard evaluations; (3) employees disciplined for poor job performance; and (4) employees that had been with Wal-Mart for less than ninety (90) days. Pursuant to the Reduction in Force Guidelines, Wal-Mart's ultimate goal was "to retain those Associates with the highest levels of performance."

Bandy instructed Silva to terminate temporary employees and then to use his discretion based on job performance. See Silva Dep. Tr. at 22-23. Silva instructed one of his support managers, Shawn Folger, to prepare a list of employees on the overnight stocking crew and to list their dates of hire. See Silva Dep. Tr. at 76-77.

Upon reviewing the list, Silva identified two temporary employees and selected them for termination. See Silva Dep. Tr. at 75-78. Silva then met with Folger and the other support manager, Gus Toppa, to discuss which additional employees should be terminated based on their relative levels of productivity. See Silva Dep. Tr. at 44. The three managers, one of whom is African-American, unanimously agreed that Dias and Igle should be terminated because they were not as productive as the other employees on the overnight stocking crew. See id. Silva acknowledged that he did not review any personnel files when deciding who to terminate, and instead relied on his own experiences working with the members of the overnight stocking crew. Id. at 24, 42-43, and 46. At about this time, other employees on the overnight stocking crew were terminated for reasons unrelated to productivity.

In total, 8 employees were terminated from the overnight stocking crew during December 2002, thereby reducing the number of employees on the crew from 33 to 25. See Affidavit of Alan Centazzo ("Centazzo Aff.") ¶ 4b. Of the 8 employees that were

terminated in December 2002, 4 were black, 3 were white, and 1 was Hispanic. Centazzo Aff. ¶ 4c. Of the remaining 25 employees remaining on the overnight stocking crew, 13 were black, 10 were white, and 2 were Asian-Americans. Centazzo Aff. ¶ 4d. Of the 25 employees that were retained on the overnight stocking crew, 14 had less seniority than Dias. Centazzo Aff. ¶ 4e. Of the 14 employees that were retained on the overnight stocking crew with less seniority than Dias, 9 were black, 5 were white, and 1 was Asian-American. See Centazzo Aff. ¶ 4f.

B. The Pleadings

On or about July 19, 2004, Dias and Igle filed a Complaint in the Rhode Island Superior Court alleging that they were terminated on the basis of race in violation of Title VII of the Civil Rights Act of 1964 and the Rhode Island Fair Employment Practices Act. The case was later removed to this Court. In support of his Complaint, Dias alleged that he was terminated on the basis of race because white employees with less seniority were retained and that Wal-Mart was obligated to make employment decisions based on seniority. Dias admits, however, that Wal-Mart has no written policy establishing that terminations must be based on seniority. See Dias Dep. Tr. at 22-24.

C. The Evidence (Or Lack Thereof) Of Discrimination Or Pretext

Dias has never come forward with any admissible evidence to establish that he performed his job satisfactorily or that Wal-Mart was not race neutral in its termination decisions. Similarly, Dias has failed to come forward with any evidence to demonstrate that Wal-Mart's stated legitimate, non-discriminatory decision to terminate him as part of a reduction in force because of his relatively low productivity was merely a pretext for a race-based discrimination.

In his interrogatory answers, Dias indicated that the only instance of discriminatory treatment at Wal-Mart involved restrictions placed on movies and music in the break room and the sales floor. See Plaintiff Dias' Answers to Interrogatories, Answer No. 10, attached as Exhibit 6. Dias alleged that black employees were not allowed to watch "the kind of movies that blacks enjoyed" or listen to "rap music." Id. During his deposition, Dias explained that a white female employee complained about the types of movies and music that were being played. See Dias Dep. Tr. at 49. Dias admitted that the movies were "gangster rap movie[s]" that contained content regarding drugs and "pimping," and depicted scenes where a man would "degrade a woman." Dias Dep. Tr. at 45-47. Similarly, with regard to music, Dias stated that the music contained profanity and focused on "doing things to women." Dias Dep. Tr. at 49. As a result of the complaints, the television was removed from the break room, and for a time, all employees were prohibited from listening to all types of music on the sales floor. See Dias Dep. Tr. at 50. The rules regarding music and movies were applied equally to all employees, regardless of race. See Dias Dep. Tr. at 50.

## ISSUES

1. The first issue in this case is whether Dias can establish a prima facie case of racial discrimination in the context of a reduction in force. Specifically, the issue is whether there are any genuine material facts in dispute that would permit Dias to prove: (i) that he performed his job satisfactorily and (ii) that Wal-Mart was not race neutral in its decision to terminate him or in retaining white employees on the overnight stocking crew.

2. Assuming, *arguendo,* that Dias can establish a prima facie case of racial discrimination, the second issue is whether there are any genuine material facts in dispute that would permit Dias to prove that his relatively low productivity was a pretext for a race-based termination.

## POINTS AND AUTHORITIES

## WAL-MART IS ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFF CANNOT PROVE HIS CLAIM OF DISCRIMINATION

Dias cannot prove his prima facie case of discrimination by Wal-Mart because he lacks any evidence of either his own ability to perform the job requirements or that Wal-Mart employed race as a factor in its employment decisions. Nor can he show that Wal-Mart's claim that his productivity was relatively low is nothing more than a pretext for racial discrimination. Absent any such evidence, Wal-Mart is entitled to summary judgment on his discrimination claims.

### I. STANDARD OF REVIEW AND PLAINTIFF'S BURDEN OF PROOF

Summary judgment is warranted if the court determines "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once the moving party avers the absence of genuine issues of material fact, the nonmovant must show, through materials of evidentiary quality, that such a dispute exists." *Rathbun v. Autozone, Inc.*, 361 F.3d 62, 66 (1st Cir. 2004). "[E]vidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment." *Vasquez v. Lopez-Rosario*, 134 F.3d 28, 33 (1st Cir. 1998). In determining whether summary judgment is appropriate, the court views the evidence in the light most favorable to the non-moving party. *Continental Cas. Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 373 (1st Cir. 1991). Nonetheless, "[a]

properly supported motion for summary judgment cannot be defeated by relying upon improbable inferences, conclusory allegations, or rank speculation." *Rathbun*, 361 F.3d at 66 (citing *Mesnick v. General Electric Co.*, 950 F.2d 816, 822 (1st Cir. 1991)).

A claim for employment discrimination - such as this - where there is no direct evidence of discrimination by the employer is governed by the three-step burden-shifting analysis set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny.[2] Pursuant to the *McDonnell Douglas* burden-shifting paradigm, a plaintiff must first prove, by a preponderance of the evidence, a *prima facie* case of racial discrimination. *Id.* at 802. If the plaintiff successfully establishes a prima facie case of discrimination, the burden shifts to the defendant to "articulate a legitimate, non-discriminatory reason" for the adverse employment action. *Id.* at 802. This is only a burden of production, not persuasion, as the burden of persuasion remains with the plaintiff at all times. *Lewis v. City of Boston*, 321 F.3d 207, 214 (1st Cir. 2003); *Udo v. Tomes*, 54 F.3d 9, 12 (1st. Cir 1995). In other words, as long as a defendant states a legitimate, non-discriminatory reason for the adverse employment action, it has carried its burden and the presumption of discrimination created by the prima facie case disappears. *Id.* Once the defendant has met its burden of production, the burden shifts back to the plaintiff, who must then show

---

[2] Although Dias has asserted discrimination claims under both Title VII and FEPA, the Rhode Island Supreme Court has long followed the analysis contained in federal case law decided under Title VII in analyzing FEPA claims. *E.g., Casey v. Town of Portsmouth*, 861 A.2d 1032, 1036-38 (R.I. 2004); *Nicolae v. Miriam Hospital*, 847 A.2d 856, 860 (R.I. 2004); *Mine Safety Appliances Co. v. Berry*, 620 A.2d 1255, 1258 (R.I. 1993); *Newport Shipyard, Inc. v. Rhode Island Commission for Human Rights*, 484 A.2d 893, 898 (R.I. 1984); *see also, e.g., Wyss v. General Dynamics Corp.*, 24 F.Supp.2d 202, 210 (D.R.I. 1998). Because employment discrimination claims under Title VII and FEPA are analyzed in the same manner, the analysis contained herein applies with equal force to Plaintiff's claims under both statutes. *See id.*

that the reason(s) articulated for the adverse employment decision are pretextual and that intentional discrimination was the real reason for the decision. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 508, 510-11, 515-17 (1993); *Udo,* 54 F.3d at 13. To satisfy this third and final prong of the *McDonnell Douglas* burden-shifting framework, "a plaintiff must do more than simply cast doubt on an employer's justification." *Nicolae*, 847 A.2d at 860 (quoting *Resare v. Raytheon Co.*, 981 F.2d 32, 42 (1st Cir. 1992). Rather, a plaintiff must introduce sufficient evidence to support two findings: (1) that the employer's articulated reason for laying him off is a pretext, and (2) that the true reason is discriminatory. *Udo*, 54 F.3d at 12; *see Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 16 (1st Cir. 1994) ("Title VII does not grant relief to a plaintiff who has been discharged unfairly, even by the most irrational of managers, unless the facts and circumstances indicate that discriminatory animus was the reason for the decision.").

In the context of a reduction in force, a plaintiff claiming discrimination on the basis of a protected characteristic faces a particularly high hurdle to recovery: the allegedly aggrieved employee must demonstrate that the employer intended to discriminate on the basis of the protected characteristic in selecting him/her for termination. *See Lewis*, 321 F.3d at 216; *Cruz-Ramos v. Puerto Rico Sun Oil Co.*, 202 F.3d 381, 384 (1st Cir. 2000); *Mitchell v. USBI Co.*, 186 F.3d 1352, 1354 (11th Cir. 1999) (*per curiam*). This is because the reduction-in-force itself serves as a legitimate, non-discriminatory basis for an employee's termination. *See, e.g., Lewis*, 321 F.3d at 216 *Marcano-Rivera v. Pueblo Int'l, Inc.*, 232 F.3d 245, 252 (1st Cir. 2000); *Cruz-Ramos*, 202 F.3d at 386; *Connell v. Bank of Boston*, 924 F.2d 1169, 1174 (1st Cir. 1991).

> In a reduction in force situation, a company generally reorganizes its workforce and reassigns responsibilities to

> reduce headcount and save money. Merely demonstrating that, as a result of the reduction in force, the employer consolidated positions or allocated duties of discharged employees to other existing employees does not itself raise a reasonable inference that the employer harbored discriminatory animus toward any one employee.

*Lewis*, 321 F.3d at 216.

In *Smith v. F.W. Morse & Co., Inc.*, 76 F.3d 413 (1st Cir. 1996), the First Circuit Court of Appeals aptly noted that reductions in force do not require an employer to accord special status to those who fall within protected classes:

> There is little doubt that an employer, consistent with its business judgment, may eliminate positions during the course of a downsizing without violating Title VII ***even though those positions are held by members of protected groups*** . . .

*Id.* at 422 (emphasis added).

Moreover, in analyzing cases involving alleged employment discrimination, courts will not second-guess an employer's assessment of which employees are most qualified for a particular position. *Mesnick v. General Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991) ("Courts may not sit as super personnel departments, assessing the merits – or even the rationality – of employers' nondiscriminatory business decisions.").

## II. DIAS CANNOT ESTABLISH A PRIMA FACIE CASE OF DISCRIMINATION

Because Dias was terminated as part of a reduction-in-force, he must show the following by a preponderance of the evidence to establish a prima facie case of discrimination: (1) that he was a member of a protected class; (2) that he performed his job satisfactorily; (3) that he was discharged; and (4) that Wal-Mart was not race neutral in its decision to discharge him or in retaining personnel outside the protected class in the same position. *Lewis*, 321 F.3d at 214; *Udo*, 54 F.3d at 12.

Here, as a matter of law, Dias cannot meet his burden of proving a prima facie case of discrimination under Title VII or FEPA because he cannot prove that he was performing his job satisfactorily. His supervisor testified that Dias was selected for termination based on his poor productivity relative to that of his co-workers on the overnight stocking crew. Indeed, Dias admitted in his deposition that his supervisor spoke with him about his relatively low productivity and cited his productivity as an area requiring improvement on one of his performance evaluations. Dias Dep. Tr. at 28. This evidence is undisputed. Since poor productivity does not equate to satisfactory job performance under any reasonable analysis, Dias cannot state a prima facie case.

Dias cannot satisfy the fourth prong of the prima facie standard either because he cannot prove that Wal-Mart was not race neutral in its termination decisions. Dias argues -- in the face of objective statistical evidence to the contrary -- that Wal-Mart was not race neutral in its termination decisions because white employees with less seniority were retained. This argument is legally insufficient to support judgment in Dias' favor. In fact, it has previously been rejected by the First Circuit in an analogous case. *See Cruz-Ramos, 202 F.3d 381. Cruz-Ramos* concerned a plaintiff who alleged age discrimination in the context of a reduction in force.[3] *Cruz-Ramos*, 202 F.3d at 383. In *Cruz-Ramos*, the First Circuit Court of Appeals affirmed the district court's grant of summary judgment in favor of the employer, stating, in part, as follows:

> [T]he fact that the appellant was older than all but one of the persons retained proves nothing of consequence. The appellant's burden was

[3] Courts apply the same analysis and principles of law in considering claims of age discrimination as they do in considering claims under Title VII of the Civil Rights Act. *Tardie v. Rehabilitation Hosp. of Rhode Island*, 6 F.Supp.2d 125, 132-33 (D. R.I. 1998), *aff'd*, 168 F.3d 538 (1st Cir. 1999); *Corrigan v. Rhode Island, Dept. of Business Regulation*, 820 F.Supp. 647, 652 n.3 (D. R.I. 1993); *Newport Shipyard, Inc. v. Rhode Island Comm'n for Human Rights*, 484 A.2d at 897-98.

> to adduce facts tending to show that [his former employer] furloughed him because of his age, and he cannot carry that burden simply by a comparison of ages within a sample that lacks statistical significance. At a bare minimum, he must offer some evidence to show that the rating system used by the employer was flawed in its design or distorted in its implementation. Because [the employer's] stated basis for reaching the disputed employment decision was not in any way impugned by a mere recitation of the age of those in the relevant labor pool, that datum, standing alone, could not defeat [the employer's] summary judgment initiative.

*Id.* at 385.

The facts of this case weigh even more strongly in favor of granting summary judgment than the facts of *Cruz-Ramos*, because the plaintiff in *Cruz-Ramos* was older than all but one of the employees retained; in this case, of the 14 employees that were retained on the overnight stocking crew who had less seniority than Dias, 9 were black, 4 were white, and 1 was Asian-American. Centazzo Aff. at ¶ 4f. As the evidence establishes, a greater number of black employees with less seniority were retained than white employees with less seniority. Thus, Dias cannot establish that the system employed by management in selecting the employees to terminate was racially biased against black employees. Similarly, Dias cannot establish that he was targeted on the basis of race because white employees with less seniority were retained. The facts establish that fewer white employees with less seniority were retained than black employees with less seniority. Accordingly, Dias cannot establish that Wal-Mart was not race neutral in discharging him or retaining personnel outside of the protected class, as is necessary to establish a prima facie case of discrimination.

## III. DIAS CANNOT ESTABLISH THAT THE REDUCTION IN FORCE AND USE OF PERFORMANCE AS THE CRITERIA FOR HIS TERMINATION WERE A PRETEXT FOR DISCRIMINATION

Even assuming, *arguendo*, that Dias can meet his initial burden, his case clearly fails at the third stage of the *McDonnell Douglas* burden-shifting paradigm because Dias cannot establish that Wal-Mart's explanation for his termination is a pretext for discrimination. The reason articulated by Wal-Mart for Dias' selection for termination – his poor productivity relative to that of his co-workers – clearly satisfies Wal-Mart's burden as to the second stage of the *McDonnell Douglas* paradigm. Accordingly, in order to establish a viable claim for discrimination, Dias must produce evidence showing that Wal-Mart's stated reasons for his termination were a pretext and that intentional discrimination was the real reason he was discharged. Plainly, Dias cannot satisfy this burden.

Reductions in force are an unfortunate reality in the modern business world. As much as it would like to be immune, Wal-Mart is no exception. With regard to its overnight stocking crew at the Newport store, the downsizing which occurred in December 2002 required Wal-Mart to eliminate workers who were not necessarily bad employees; they just had not, in Wal-Mart's sound business judgment, been as productive as other members of the crew. As noted by the First Circuit Court of Appeals in *Smith*:

> [A]n employee . . . runs a risk of suffering the ordinary slings and arrows that suffuse the workplace every day [he] goes to work and every day [he] stays away. Title VII is neither a shield against this broad spectrum of employer actions nor a statutory guaranty of full employment, come what may.

*Id.* at 425.

Here, Dias may attempt to argue that management's failure to follow every criteria set forth in Wal-Mart's internal "Reduction of Workforce Guidelines" (the "Guidelines")

is evidence of pretext. As an initial matter, the Guidelines are merely what they say they are – guidelines. Moreover, the stated goal of the Guidelines "is to retain those associates with the highest levels of performance." Dias is likely to argue that the Guidelines require that employees should be terminated based on seniority or on a last in/first out basis. The Guidelines specifically state that during a reduction in force management is to "[t]erminate associates who have been with [Wal-Mart] for less than 90 days." Although the Guidelines do not establish an overriding seniority policy at Wal-Mart, they do establish that temporary employees should be terminated first as part of a reduction in force. Here, the facts establish that temporary employees were in fact terminated first. The three members of management, one of whom is black, then unanimously decided who were the least productive employees on the overnight stocking crew in accordance with the overall policy of the Guidelines. The managers selected Dias for termination as one of the least productive members of the overnight stocking crew based on their experience working with Dias on a nightly basis. Silva Dep. Tr. 24, 42-43.

Although Wal-Mart's managers did not follow the Guidelines with total precision, that evidence does not establish that the reduction in force or use of productivity as the determining factor was a pretext for discrimination. Instead, the facts establish that of the eight employees that were terminated from the overnight stocking crew in December 2002, 4 were black, 3 were white, and 1 was Hispanic. Centazzo Aff. ¶ 4c. With regard to Dias' anticipated seniority argument, the facts also establish that a larger number of black employees with less seniority were retained. Thus, even if there was a overriding seniority policy at Wal-Mart, which there was not, there is no evidence that the policy

was ignored by management in an attempt to target Dias or other black employees because of their race.

Dias will also likely argue that he was exposed to other instances of discriminatory treatment during his tenure at Wal-Mart in an effort to establish pretext. In his interrogatory responses, Dias stated one instance of what he alleges was racially discriminatory treatment. Plaintiff Dias Answers to Interrogs., Answer No. 10. According to Dias, black employees were not allowed to watch "the kinds of movies that blacks enjoyed" or listen to "rap music." Id. When quested about these issues during his deposition, Dias explained that a white female employee had complained about the movies and music because of the content. Dias Dep. Tr. at 49. Dias admitted that the movies were "gangster rap movie[s]" that contained content regarding drugs and "pimping," and depicted scenes where a man would "degrade a woman." Dias Dep. Tr. at 45-47. Dias also stated that the music contained profanity and focused on "doing things to women." Dias Dep. Tr. at 49. As a result of the complaints, the television was removed from the break room and that all employees were prohibited from listening to all types of music on the sales floor. Dias Dep. Tr. at 50. Dias admitted that the rules regarding music and movies were applied equally to all employees, regardless of race. Dias Dep. Tr. at 50.

Although Dias did not include any other instances of alleged discriminatory treatment in his interrogatory responses, he made several unsubstantiated allegations during his deposition. For example, Dias alleged that management would "ride" black employees for calling in sick, but not white employees. Dias stated that one white employee, Timothy Wall, called in sick on several occasions, but Dias admitted that Wall

was reprimanded for this behavior. Dias also alleged that black employees on the second shift were "being ridden" by management more than white employees. When questioned about these instances, Dias could not provide the name or a date for any alleged instance of discriminatory treatment of black employees. Moreover, Dias had no basis to comment on treatment of second shift employees because he did not work during that shift.

In sum, the instances of discriminatory treatment alleged by Dias are supported by nothing more than unsubstantiated and self-serving testimony. This does not, as a matter of law, satisfy his burden on a summary judgment motion. *Vasquez,* 134 F.3d at 33 (inadmissible hearsay insufficient to prevent the issuance of summary judgment in favor of movant); *Continental,* 924 F.2d at 373 ("improbable inferences, conclusary allegations and rank speculation" will not defeat a properly supported motion for summary judgment).

## CONCLUSION

For all of the foregoing reasons, Wal-Mart respectfully requests that this Court grant its motion for summary judgment with respect to all of Plaintiff's claims.

Dated: Providence, Rhode Island
July 15, 2005

Respectfully submitted,

Defendant
WAL-MART STORES, INC.
By its attorneys,

GEOFFREY W. MILLSOM (#6483)
MICHAEL D. CHITTICK (#5967)
JAIME J. LAPORTE (#6668)
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
Tel: (401) 274-7200
Fax: (401) 751-0604

CERTIFICATE OF SERVICE

I hereby certify that I am over 18 years of age and not a party to this action. On July 15, 2005, I caused the foregoing Memorandum of Law In Support of Wal-Mart's Motion for Summary Judgment to be served by first class mail, postage prepaid, upon the following:

Robert M. Novack, Esq.
Clarkin, Galvin, Lowenstein & Novack
Post Office Box 267
84 North Main Street
Fall River, MA 02720

*332596_1.doc*

FILED