wouldn't hold the documents. The assistant or the grocery manager would just show them to me, and they would be destroyed or thrown away but I would use them, yes.

Q. All right. And you said Rojacks had a different policy or did not have a different policy?

A. Basically the industry is the same, they -- regardless if it's an independent or a Stop & Shop or a Shaws, the standards are the same throughout the industry. The policy is basically the same.

Q. When you say, "the standards are the same," you're not saying the standards are the same for union versus nonunion, are you?

A. Yes.

Q. They are?

A. Yes, they are.

Q. So when you talk about layoffs or reduction of force for Stop & Shop, it wouldn't be pursuant to the union contract?

MS. LaPORTE: Objection.

THE WITNESS: They would have to follow the union guidelines but they could also





set up a case for poor performing workers.

Q. BY MR. NOVACK: No, I understand. You're talking about a discipline action.

A. No, not discipline, just performance.

Q. You're talking about, well, you understand the difference between when there's a reduction in force versus a poor performer?

MS. LaPORTE: Objection.

Q. BY MR. NOVACK: Do you understand the two different situations I'm talking about?

A. Yes.

Q. The reduction of forces as I understand it where there's, you know, for financial reasons there has to be a mandatory cut in personnel; is that correct?

A. Not for financial reasons, it's basically for lack of work.

Q. Well, all right. For lack of work?

A. For lack of work, a reduction in the work force.

Q. And is it fair to say that for the union shops, when it was for a reduction of force for lack of work, the sole criteria was seniority?





MS. LaPORTE: Objection.

THE WITNESS: Correct.

Q. BY MR. NOVACK: Okay. Not to say that under a union shop if someone was not able to do the job or not working up to what the requirements of the job were, you could terminate them for that reason?

A. You could terminate them but you would have to build a case with the union.

Q. You go through arbitration?

A. You go through arbitration, more documentation.

Q. Okay. Now, when you began work for Wal-Mart, did you have any training in, you said you had training in personnel management; is that correct?

A. Yes.

Q. Okay. Were you trained at all in any kind of policy that Wal-Mart had with regard to reduction in force?

A. Not training, no, not while I was doing my personnel training, no.

Q. At some other time were you trained as to Wal-Mart's policies regarding reduction in





forces?

A. Yes.

Q. When was that?

A. It was January, I believe, of 2004.

Q. And what was the occasion for that?

MS. LaPORTE: Can we go off the record for a second?

MR. NOVACK: Sure.

(Discussion held off the record.)

MR. NOVACK: Back on the record.

Q. BY MR. NOVACK: Mr. Silva, did you want to correct some dates that you have given us previously as to when you began with Wal-Mart and when you had certain training?

A. I believe it was, I'm not sure but I believe it was January of 2002 that I started with them.

Q. Okay. And you also indicated that you had some training in reduction of force, Wal-Mart policies?

A. Yes.

Q. And when do you believe that happened?

A. January of 2003.

Q. Okay. And where did you get the

training in reduction of force policies?
A. Wal-Mart has guidelines you follow, you pull it up on the policy page.
Q. Okay. And how did you come to know about these policies?
A. Through the store manager.
Q. And who was that?
A. It was David Bandy at the time.
Q. And which store were you at at the time?
A. Newport.
Q. David Bandy was the store manager?
A. Correct.
Q. When did Charlie Roger become store manager?
A. Probably in April or May, I'm not sure.
Q. Of that year 2003?
A. Yes.
Q. So David Bandy was before him?
A. Yes.
Q. And how did he happen to talk to you about reduction in force guidelines?
A. The company policy page. We were



6/7/2005 Deposition of William Silva

overstaffed overnights and we had to cut down the crew, cut down the staffing overnights.
Q. The overnight crew. And so did Mr. Bandy instruct you to make some layoffs?
A. Yes.
Q. And you talked with him, as I understand you talked with him prior to making these layoffs?
A. Yes.
Q. As to what criteria to follow?
A. Yes.
Q. And was this the first time you were asked to make layoffs for Wal-Mart?
A. Yes.
Q. And what did Mr. Bandy tell you as far as the policy to be followed?
A. The first people we hired, temporary help for Christmas, those were the first ones to go, and then it was at my discretion to keep the performers that were good workers.
Q. Okay. When you said your discretion, what did you understand that to mean?
A. In my opinion.
Q. Did he give you any guidelines to use



6/7/2005 Deposition of William Silva

as to how you determine who were the good performers?
A. Basically it was job performance.
Q. But did you go over with him any guidelines to follow?
A. Well, the company standards, pieces per hour then came into play, attendance.
Q. Okay. You talked about pieces per hour and attendance. Now, were those the standards that you used for performance?
A. Yes.
Q. Okay. Well, at the time that you made the layoffs, how many people were on the overnight stocking crew?
A. I'm not quite sure. It was over 25, I believe.
Q. All right. And do you know Mr. Dias here?
A. Yes, I do.
Q. And he was a member of that crew at the time?
A. Yes, he was.
Q. Okay. And when were you told by Mr. Bandy that there were to be layoffs?



6/7/2005 Deposition of William Silva

A. I don't remember the exact day.
Q. Would it have been before the Christmas season?
A. No, it was after Christmas.
Q. Okay. And when he told you there were going to be layoffs, how much time did you have to make the decision as to who would be laid off?
A. I don't remember.
Q. Well, would it have been a week?
A. Approximately a week or two weeks.
Q. Okay. Now, do you understand that you were to evaluate these people, these 25 people, in two weeks' time and make a decision as to who should be laid off?
A. You don't evaluate someone in two weeks' time, it's an ongoing process. I have been on overnights for six months.
Q. All right. And your responsibility on overnights for that six months had been what area?
A. The entire store.
Q. Okay. So that included the overnight stocking crew?

other people too?
A. Everyone was.
Q. Now, if Mr. Dias was helping someone else in other areas and we still count pallets; correct?
A. Correct.
Q. It would be fair to say that the person that Mr. Dias was helping would get credit in the pallet count for the pallets that Mr. Dias helped them with; isn't that correct?
A. Correct.
Q. Now, it's fair to say there was no record of whether the pallet count by other workers were done by themselves or with the help of other associates, were there?
A. There was no record but we would all know, myself and the support manager would know.
Q. And how would you know, Mr. Silva?
A. We would have to send them over there to help them.
Q. And how did you keep track of that?
A. We mentally, you make a mental note.
Q. And how many times did Mr. Dias go over to help someone else?





A. I have no idea. I can't recall.
Q. Well, you must have some idea?
MS. LaPORTE: Objection. He said he doesn't know, that was his answer.
Q. BY MR. NOVACK: You had 25 overnight stockers; is that correct?
A. Twenty-five, yeah, it was probably a correct number.
Q. And you told us that you wanted to keep track of the pallet production on a nightly basis; is that correct?
A. Correct.
Q. And was that an important piece of information to know as to the production on the pallets every night?
A. The first question that the store manager would ask is how many pallets of freight were killed that night.
Q. So that was very important?
A. Very important, yup.
Q. When you came to make a decision as far as who should be laid off based on your six months of being the assistant store manager, the information as to which employees helped other





employees and how much, that's all in your head; is that correct?
A. Well, it would be with me and my two support managers. They would report back to me.
Q. But you kept six months of that information all in your head?
A. Yes.
Q. And why didn't you write it down, Mr. Silva?
A. I have no reason to.
Q. Well, didn't that determine how productive a particular employee was or was not?
MS. LaPORTE: Objection. If you can answer.
THE WITNESS: It would but if I had the knowledge in my mind, why would I need to write it down?
Q. BY MR. NOVACK: Are you telling us you -- at the time of the layoffs, Mr. Silva, are you telling us you could tell at that time, you knew how many times Mr. Dias or Mr. Igle or any of the other overnight stockers, how much time they spent assisting other stockers?
A. No, I couldn't tell you that.





Q. Not even at the time of the layoffs?
A. No.
Q. You just had a general impression; is that correct?
A. Correct.
MS. LaPORTE: Can we go off the record for a minute?
MR. NOVACK: Sure.
(Break taken.)
Q. BY MR. NOVACK: Let's go back to talking about the layoffs that were made regarding Mr. Dias and Mr. Igle. Can you tell me when they were laid off?
A. No, I don't remember the exact date.
Q. If I suggested to you that it was after Christmas in 2002, would that refresh your recollection?
A. Possibly. It could have been after Christmas 2002. It probably was.
Q. And you made, fair to say you made the ultimate decision on who to lay off; is that correct?
A. It was discussed between my two support managers and myself.

Q. And when did you begin these discussions with your two support managers?

A. As far as the layoffs is when we were told by store management that there was a reduction in work force.

Q. And how many people were you told that you were going to have to lay off?

A. I think I had to reduce my work force by half, probably like 12 people.

Q. Excuse me, what did you say?

A. Twelve people.

Q. Twelve people?

A. By 12 people.

Q. By 12 people, okay. Can you tell me were there -- the 12 people of the 25 people that were originally in the group, were there written evaluations ever performed on these people?

A. Yes.

Q. And who performed these evaluations?

A. It would be the assistant over the area at the time.

Q. And were evaluations considered by you and your support manager in making the decision





of reduction in force?

A. The written evaluations, yes, they would be.

Q. Well, I didn't ask you if they would be, were they specifically?

A. If we wanted to look at their file, we could look at it.

Q. So I understand, let's be clear here, Mr. Silva, you indicated that you were directed to lay off 12 people out of your 25 member crew; is that correct?

A. Correct.

Q. So the question is what information did you base those layoffs on, and I asked you about the evaluations. Did you base your, in any degree, your decision to lay off on the written evaluation?

A. No, I didn't personally.

Q. Okay. Did you personally look at the evaluations?

A. No.

Q. Did any one of your support managers?

MS. LaPORTE: Objection. You can answer.





MR. NOVACK: If you know.

THE WITNESS: I don't know but I don't believe they have privilege to it.

Q. Say that again?

A. They don't have privilege to that information.

Q. So they would not have been able to look it?

A. No.

Q. So do you know if anybody at Wal-Mart reviewed the evaluations of the 25 people and the crew before making the decision to lay off?

MS. LAPORTE: Objection.

THE WITNESS: No, I don't think so.

Q. BY MR. NOVACK: Okay. So it's fair to say the performance evaluations were not considered in any way regarding the decision to lay off?

MS. LaPORTE: Objection.

THE WITNESS: Correct.

Q. BY MR. NOVACK: Now, Wal-Mart, you're familiar with the performance evaluations of how they're set up for Wal-Mart; is that correct?





A. Yes.

Q. And Wal-Mart indicates on the evaluation overall whether an employee is meeting the expectations, exceeds expectations or below expectation; is that correct?

A. Correct.

Q. And did you ever have an occasion to look at Mr. Dias's evaluation?

A. I don't believe I did.

Q. So you wouldn't know whether Mr. Dias was evaluated as a good worker or a bad worker or what; is that correct?

MS. LAPORTE: Objection.

THE WITNESS: Correct.

Q. BY MR. NOVACK: And can you tell me was there a particular reason you did not look at the evaluation?

A. I wouldn't want to go by someone else's standards if I had to make a decision like that myself.

Q. Well, did you say that the standard was made, that the decision was made by you in conjunction with your two?

A. Support managers.

Q. BY MR. NOVACK: Is that your answer, Mr. Silva?

A. I don't know if they were coached.

Q. Now, how would you know if someone were given a verbal coaching?

MS. LaPORTE: Objection. You can answer.

THE WITNESS: He would have to mention that to probably the store manager. If it took place during my night off, he would have to mention it to the store manager the following day.

Q. BY MR. NOVACK: And would he record it somewhere?

MS. LaPORTE: Objection. Who is he?

Q. BY MR. NOVACK: The store manager.

A. Not the verbal coaching, no.

Q. And the next step would be the written coaching?

A. Correct.

MS. LaPORTE: I'm just going to object. Mr. Novack, you have been asking and reasking a lot of questions. This is starting





to take an excessive amount of time, so if you could limit your questions to asking the question once. You already asked him about that so I'm just going to state on the record that this is really taking an excessive amount of time.

Q. BY MR. NOVACK: Going back to the coaching, Mr. Silva, the next step in the coaching would be the written you told me?

A. Correct.

Q. How would you know, for example, that someone had already had a failed verbal coaching and to move onto the written part if it wasn't recorded anywhere?

A. The store manager would have to record it. He would have a personnel file.

Q. And the store manager would know that there had been a verbal so he would go on to the written?

A. Correct.

Q. Okay. And the written would be documented in the employee's personnel file?

A. Correct.

Q. Okay. And the last criteria here is,





if you didn't get your appropriate reduction by the first three, is to use what they call last in, first out; is that correct?

A. Correct.

Q. What does that mean?

A. People you hired last would be the first people you let go.

Q. That would be what we mean as seniority?

A. That would be the 90-day associate would be the first one to go.

Q. Okay. And then after that?

A. It would be the last, the last hires would be the first to go.

Q. So in other words, where we talk about the last in, first out, the 90-days would be the first to go regardless of whether they were 89 days or two days; is that correct?

A. Right.

Q. And when you got beyond the 90 days when you had to still make reductions, then it would be last in, first out?

A. Correct.

Q. Okay. Now, did you follow this





criteria in laying off in making the reduction of force?

A. Yes, I believe to the best of our ability we did.

Q. Okay. And were there any employees who were not laid off that had less seniority than either Mr. Dias or Mr. Igle?

A. I can't answer. I don't believe there was but I would have to see the records.

Q. Well, I was provided with some records here and perhaps you can help me with them at least.

MR. NOVACK: Off the record.

(Discussion held off the record.)

Q. BY MR. NOVACK: Let me show you a document, Mr. Silva, and ask if you can identify what document that is?

A. No, no, I have never seen this.

MR. NOVACK: Why don't we mark this Exhibit 3.

(Exhibit 3 was marked for identification.)

Q. BY MR. NOVACK: So Mr. Silva, what documents, if any, did you use to ascertain who

was last in, first out?

A. The associate's personnel file is listed on a computer, you can go into the computer and see who was hired when.

Q. And did you do that?

A. Yes, I believe Shawn Folder did that. I designated Shawn to do that.

Q. Okay. And did Shawn get a printout of who was the last date of hire for the members of the --

MS. LaPORTE: Objection.

MR. NOVACK: -- crew?

THE WITNESS: I don't believe he got a print out. No, I believe he wrote it down.

Q. BY MR. NOVACK: Did you ever see a list? Did Mr. Folder make a list?

A. Yes.

Q. Okay. And what was on that list?

A. As far as I can remember, it was the associate's name and the date of hire.

Q. Okay. And that would have been something like that was listed on Exhibit 2?

MS. LaPORTE: Objection.





THE WITNESS: No, I believe he just wrote it on a yellow pad.

Q. BY MR. NOVACK: Okay. And do you know where that yellow pad is now?

A. I have no idea.

Q. Was it submitted to the store manager?

A. I have no idea what he did with it.

Q. Okay. And where did you indicate that?

A. Here it is.

Q. You indicated that you had two temporary associates; correct?

A. To the best of my knowledge, yes.

Q. Okay. And we already agreed that you didn't look at who had below evaluations in making the decision; correct?

A. Correct.

Q. And did I ask you if any employees were terminated because of coaching?

MS. LaPORTE: Objection. Asked and answered. You can answer again.

THE WITNESS: When you asked me that, I had no recollection of it. It wasn't told to me.





Q. BY MR. NOVACK: So if none were, if none were then, if none were terminated because of having a current coaching, it would be fair to say that all of the other employees would be terminated based on the last in, first out criteria?

A. That's Wal-Mart. That's the way they wanted you to do it; correct.

Q. So is it fair to say with regard to the layoffs regarding Mr. Dias and Mr. Igle, that with regard to the, with the exception of the two temporary associates, all the other layoffs were made on seniority basis?

MS. LaPORTE: Objection.

THE WITNESS: That's the way it should have been, correct.

Q. BY MR. NOVACK: So the intent was besides the temporary employees, to lay off by seniority; correct?

MS. LaPORTE: Objection.

THE WITNESS: Correct.

Q. BY MR. NOVACK: And that was the policy that you were told to do by the store manager?





A. Correct.

Q. Did you ever hear that some of the layoffs with regard to the overnight working crew were not made according to seniority, with the exception of the temporary employees?

A. Did I ever hear that?

Q. Yes.

A. No, I didn't.

Q. Okay. So when you say you followed this criteria, well, strike that. Let me ask you some other questions if I can here.

Can you tell me the racial composition of the overnight stocking crew prior to the layoffs?

A. I have no idea. I would have to look at the names.

Q. Okay. Could you tell me out of the 12, the 12 employees that were laid off -- you indicated that two of the temporaries were white -- with regard to the ten other employees that were laid off, what their racial composition was?

A. There again, I would have to look at the names.