training in reduction of force policies?

A. Wal-Mart has guidelines you follow, you pull it up on the policy page.

Q. Okay. And how did you come to know about these policies?

A. Through the store manager.

Q. And who was that?

A. It was David Bandy at the time.

Q. And which store were you at at the time?

A. Newport.

Q. David Bandy was the store manager?

A. Correct.

Q. When did Charlie Roger become store manager?

A. Probably in April or May, I'm not sure.

Q. Of that year 2003?

A. Yes.

Q. So David Bandy was before him?

A. Yes.

Q. And how did he happen to talk to you about reduction in force guidelines?

A. The company policy page. We were





overstaffed overnights and we had to cut down the crew, cut down the staffing overnights.

Q. The overnight crew. And so did Mr. Bandy instruct you to make some layoffs?

A. Yes.

Q. And you talked with him, as I understand you talked with him prior to making these layoffs?

A. Yes.

Q. As to what criteria to follow?

A. Yes.

Q. And was this the first time you were asked to make layoffs for Wal-Mart?

A. Yes.

Q. And what did Mr. Bandy tell you as far as the policy to be followed?

A. The first people we hired, temporary help for Christmas, those were the first ones to go, and then it was at my discretion to keep the performers that were good workers.

Q. Okay. When you said your discretion, what did you understand that to mean?

A. In my opinion.

Q. Did he give you any guidelines to use





as to how you determine who were the good performers?

A. Basically it was job performance.

Q. But did you go over with him any guidelines to follow?

A. Well, the company standards, pieces per hour then came into play, attendance.

Q. Okay. You talked about pieces per hour and attendance. Now, were those the standards that you used for performance?

A. Yes.

Q. Okay. Well, at the time that you made the layoffs, how many people were on the overnight stocking crew?

A. I'm not quite sure. It was over 25, I believe.

Q. All right. And do you know Mr. Dias here?

A. Yes, I do.

Q. And he was a member of that crew at the time?

A. Yes, he was.

Q. Okay. And when were you told by Mr. Bandy that there were to be layoffs?





A. I don't remember the exact day.

Q. Would it have been before the Christmas season?

A. No, it was after Christmas.

Q. Okay. And when he told you there were going to be layoffs, how much time did you have to make the decision as to who would be laid off?

A. I don't remember.

Q. Well, would it have been a week?

A. Approximately a week or two weeks.

Q. Okay. Now, do you understand that you were to evaluate these people, these 25 people, in two weeks' time and make a decision as to who should be laid off?

A. You don't evaluate someone in two weeks' time, it's an ongoing process. I have been on overnights for six months.

Q. All right. And your responsibility on overnights for that six months had been what area?

A. The entire store.

Q. Okay. So that included the overnight stocking crew?

would.

Q. Did you ever, either personally yourself or assign any of the support managers under you to actually track the number of pallets that each employee performed?

A. Yes.

Q. And how often did you do that?

A. We would have to track that every night.

Q. Okay.

A. At one point in time we had a chart in the back room of each employee's name and how many pallets brought back and how many empty pallets were brought back.

Q. How many empty pallets were brought back?

A. Yes.

Q. And so you're saying that at the end of every night, a record was kept on each employee as to how many pallets they did?

A. Yes.

Q. All right. Now, what happened to those charts?

A. Probably destroyed.





Q. Do you know what happened to them?

A. Well, it wasn't a piece of paper, it was a big piece of cardboard that we used to track it for the month.

Q. Was this piece of cardboard used in any way regarding making decisions in layoffs or reduction in force?

A. It was mentioned. The results of the cardboard or?

Q. Well, how was it used?

A. To find out who was working, who was actually doing their freight.

Q. So really the measure, the only measure that the chart was how many people -- which workers completed how many pallets per night; is that correct?

A. We used to take a piece count but the pallet kills, it was measured, yes.

Q. What's the difference between a piece count and a pallet kill?

A. Well, different areas have more difficult areas to stock, some nights working in with the HBA with a lot of small items.

Q. HBA?





A. Health and beauty aids. It's more difficult to stock so their productivity wouldn't be the 40 or 45 cases per hour. Their productivity would probably be 30 or 35 pieces per hour.

Q. And how do you know that?

A. How do I know what?

Q. How do you know that, isn't that depending on the person who works health and beauty?

A. Well, it is but that's the guidelines you go by.

Q. Where do those guidelines come from?

A. Those are company standards that are set up through different companies.

Q. Where do they come from, Mr. Silva?

A. They're done by time study groups.

Q. What time study groups?

A. I can't think of the name but there's different groups that actually time people putting up freight.

Q. Well, did Wal-Mart employees have these time standards?

A. No.





Q. Then how did they come to -- did you employ them personally?

A. No.

Q. Well, getting back to the original question. How do you know how many pallets or how many pieces somebody in health and beauty aids is supposed to do in a shift or night or whatever?

A. HBA, the health and beauty aids, was all broken down by the unloaders and the pallet would be at the end of the aisle and we would take a rough count before they begin stocking the freight.

Q. But you said some pallets were easier to do than other pallets; correct?

A. Correct.

Q. And how did you assess which pallets were easier and which pallets were tougher?

A. Well, the bigger the freight is, the easier it is to stock.

Q. Okay. But how did you put a number on, for example, the health and beauty aids as to what the optimum number of pieces would be done during a shift?

Q. Now the records on the pallets that were kept, well, scratch that. A pallet, the object of a pallet is to take the goods off the pallet and put it on the shelves or the display; is that correct?
A. Correct.
Q. Now would there be times when the shelves or the display were full and the pallet could not be unloaded fully?
A. At times, yes.
Q. That was not an infrequent occurrence, was it?
A. Every night we would have a certain amount of freight that wouldn't be able to go on a shelf. There would be incoming freight for the next tab which is in our flier or a buyer's request that you would have to separate.
Q. So you knew there were times when a pallet could not be unloaded and it wouldn't be the unloader's fault; is that correct?
A. The overnight stocker?
Q. The overnight stocker, I'm sorry.
A. Correct.
Q. Now, it's fair to say the records that





you kept on that cardboard chart didn't distinguish between which pallet could be unloaded completely or stocked completely and those that couldn't?
A. Correct.
Q. It just said the number of pallets that were stocked?
A. That were emptied that night, correct.
Q. So for example, taking Mr. Dias, if he had stocked the shelves so the shelves were full and the pallet still had goods on it, it would appear on the record that he had not finished that pallet; correct?
A. Not if the pallet was brought back with just one item for a tab or a buyer's request. See, as long as the POS freight was worked, we would count that as being done.
Q. What is the POS?
A. Point of sale, POS is replenishment in the system that we have.
Q. What if it was like you said before, it was for a new circular and there wasn't room on the shelf?
A. That would be taken into





consideration.
Q. Well, it wasn't registered on the chart, was it?
A. No.
Q. So how was it taken into consideration?
A. Well, we would give them probably like a half a kill.
Q. So the chart didn't just read full pallet?
A. No.
Q. It would read percentage of pallet?
A. Right.
Q. Now if you indicated that an overnight stocker, for example, got a half a kill or unloads half the pallet, would there be something on the chart that would say whether it was a half pallet because he couldn't do any more because the shelves were all stocked or that he just didn't get to it, would you distinguish that way?
A. Normally what they do is the freight has to be all opened and they write on it, each case overstock and such and such a date, so if





it was overstocked, it wouldn't go on a shelf, they would write overstock on it.
Q. Where would that be written?
A. Normally on the case, on the box.
Q. But you wouldn't keep any record of that --
A. No.
Q. -- on your cardboard chart. So is it fair to say that even if you gave an employee credit for half a pallet, there would be no way of even telling that half a pallet was because the employee wasn't that productive or the shelves were full and he couldn't do that, am I correct?
A. There was no way of keeping a record, no.
Q. Isn't it fair to say that very often if an employee could not work anymore in his area because the shelves were stocked, they were sent to help other people?
A. If they had time to do that, yes.
Q. Wasn't this a common occurrence?
A. Yes.
Q. And Mr. Dias was sent over to assist

other people too?
A. Everyone was.
Q. Now, if Mr. Dias was helping someone else in other areas and we still count pallets; correct?
A. Correct.
Q. It would be fair to say that the person that Mr. Dias was helping would get credit in the pallet count for the pallets that Mr. Dias helped them with; isn't that correct?
A. Correct.
Q. Now, it's fair to say there was no record of whether the pallet count by other workers were done by themselves or with the help of other associates, were there?
A. There was no record but we would all know, myself and the support manager would know.
Q. And how would you know, Mr. Silva?
A. We would have to send them over there to help them.
Q. And how did you keep track of that?
A. We mentally, you make a mental note.
Q. And how many times did Mr. Dias go over to help someone else?





A. I have no idea. I can't recall.
Q. Well, you must have some idea?
MS. LaPORTE: Objection. He said he doesn't know, that was his answer.
Q. BY MR. NOVACK: You had 25 overnight stockers; is that correct?
A. Twenty-five, yeah, it was probably a correct number.
Q. And you told us that you wanted to keep track of the pallet production on a nightly basis; is that correct?
A. Correct.
Q. And was that an important piece of information to know as to the production on the pallets every night?
A. The first question that the store manager would ask is how many pallets of freight were killed that night.
Q. So that was very important?
A. Very important, yup.
Q. When you came to make a decision as far as who should be laid off based on your six months of being the assistant store manager, the information as to which employees helped other





employees and how much, that's all in your head; is that correct?
A. Well, it would be with me and my two support managers. They would report back to me.
Q. But you kept six months of that information all in your head?
A. Yes.
Q. And why didn't you write it down, Mr. Silva?
A. I have no reason to.
Q. Well, didn't that determine how productive a particular employee was or was not?
MS. LaPORTE: Objection. If you can answer.
THE WITNESS: It would but if I had the knowledge in my mind, why would I need to write it down?
Q. BY MR. NOVACK: Are you telling us you -- at the time of the layoffs, Mr. Silva, are you telling us you could tell at that time, you knew how many times Mr. Dias or Mr. Igle or any of the other overnight stockers, how much time they spent assisting other stockers?
A. No, I couldn't tell you that.





Q. Not even at the time of the layoffs?
A. No.
Q. You just had a general impression; is that correct?
A. Correct.
MS. LaPORTE: Can we go off the record for a minute?
MR. NOVACK: Sure.
(Break taken.)
Q. BY MR. NOVACK: Let's go back to talking about the layoffs that were made regarding Mr. Dias and Mr. Igle. Can you tell me when they were laid off?
A. No, I don't remember the exact date.
Q. If I suggested to you that it was after Christmas in 2002, would that refresh your recollection?
A. Possibly. It could have been after Christmas 2002. It probably was.
Q. And you made, fair to say you made the ultimate decision on who to lay off; is that correct?
A. It was discussed between my two support managers and myself.

Q. And when did you begin these discussions with your two support managers?
A. As far as the layoffs is when we were told by store management that there was a reduction in work force.
Q. And how many people were you told that you were going to have to lay off?
A. I think I had to reduce my work force by half, probably like 12 people.
Q. Excuse me, what did you say?
A. Twelve people.
Q. Twelve people?
A. By 12 people.
Q. By 12 people, okay. Can you tell me were there -- the 12 people of the 25 people that were originally in the group, were there written evaluations ever performed on these people?
A. Yes.
Q. And who performed these evaluations?
A. It would be the assistant over the area at the time.
Q. And were evaluations considered by you and your support manager in making the decision





of reduction in force?
A. The written evaluations, yes, they would be.
Q. Well, I didn't ask you if they would be, were they specifically?
A. If we wanted to look at their file, we could look at it.
Q. So I understand, let's be clear here, Mr. Silva, you indicated that you were directed to lay off 12 people out of your 25 member crew; is that correct?
A. Correct.
Q. So the question is what information did you base those layoffs on, and I asked you about the evaluations. Did you base your, in any degree, your decision to lay off on the written evaluation?
A. No, I didn't personally.
Q. Okay. Did you personally look at the evaluations?
A. No.
Q. Did any one of your support managers?
MS. LaPORTE: Objection. You can answer.





MR. NOVACK: If you know.
THE WITNESS: I don't know but I don't believe they have privilege to it.
Q. Say that again?
A. They don't have privilege to that information.
Q. So they would not have been able to look it?
A. No.
Q. So do you know if anybody at Wal-Mart reviewed the evaluations of the 25 people and the crew before making the decision to lay off?
MS. LAPORTE: Objection.
THE WITNESS: No, I don't think so.
Q. BY MR. NOVACK: Okay. So it's fair to say the performance evaluations were not considered in any way regarding the decision to lay off?
MS. LaPORTE: Objection.
THE WITNESS: Correct.
Q. BY MR. NOVACK: Now, Wal-Mart, you're familiar with the performance evaluations of how they're set up for Wal-Mart; is that correct?





A. Yes.
Q. And Wal-Mart indicates on the evaluation overall whether an employee is meeting the expectations, exceeds expectations or below expectation; is that correct?
A. Correct.
Q. And did you ever have an occasion to look at Mr. Dias's evaluation?
A. I don't believe I did.
Q. So you wouldn't know whether Mr. Dias was evaluated as a good worker or a bad worker or what; is that correct?
MS. LAPORTE: Objection.
THE WITNESS: Correct.
Q. BY MR. NOVACK: And can you tell me was there a particular reason you did not look at the evaluation?
A. I wouldn't want to go by someone else's standards if I had to make a decision like that myself.
Q. Well, did you say that the standard was made, that the decision was made by you in conjunction with your two?
A. Support managers.

record; is that correct?

A. As far as attendance, we have to sign off on attendance tracking every week, who is ever in your area, the assistant manager has to sign off on it.

Q. I understand. But you indicated in making the decision for layoffs, you did not look at any records on attendance?

A. Correct.

Q. And you didn't know if your two support managers did?

A. No, I don't know.

Q. Okay. In your conversations with them regarding layoffs, did the subject of attendance come up?

A. Yes.

Q. And did anyone bring to your attention any records of any of the workers' attendance?

A. No.

Q. So fair to say you spoke in general terms of attendance among the 25 members of the crew; is that correct?

A. Correct.

Q. And this was based on memory?





A. No. They have a call-out book that is kept at the front office and they would have to report the call-outs to me when I walked in who called out on overnights.

Q. And did you use this book in assessing the attendance?

A. We used the book daily for answers.

Q. Well, I understand. But I mean at some point you were given a couple of weeks from what you said from your manager, Mr. Bandy, to make these reductions and you would make this decision. Did you use the book during this time as part of the process?

A. No.

Q. So any input that you or as far as you know the other two support managers had on attendance was in their head?

MS. LaPORTE: Objection. He can't testify as to what was in the other people's head.

MR. NOVACK: I said as far as he knows.

MS. LaPORTE: Objection. Asked and answered.





THE WITNESS: Yes.

Q. BY MR. NOVACK: Now the books would have been available, were they not?

A. Yes.

Q. Was there any particular reason you didn't go to the book?

MS. LaPORTE: Objection.

THE WITNESS: You wouldn't just know by memory how many times you had to put someone else in that area to cover 'cause you weren't allowed to leave the store until all departments were full.

Q. BY MR. NOVACK: So we have attendance and we have productivity as the two credits that you mentioned in determining who would be laid off; is that correct?

MS. LaPORTE: Objection.

THE WITNESS: Correct.

Q. BY MR. NOVACK: Is that correct?

A. Correct.

Q. Now, how did you weigh the attendance and productivity, I mean were they equally important, was one more important than the other, how did you decide that?





A. Productivity would be more important, as far as I am concerned, and my support manager. Attendance tracking would, a lot of people have medical conditions that you have to take into account so that wouldn't weigh as heavily as performance.

Q. So if someone had an excused absence, that would not weigh as heavily?

A. No.

Q. You're saying, are you agreeing or not agreeing with me?

A. I'm agreeing with you.

Q. Now can you tell me if Mr. Dias or Mr. Igle had an excessive amount of absence?

A. No, I can't remember that. I don't remember that.

Q. Do you remember whether absences were a factor in your decision on whether or not to lay off Mr. Dias or Mr. Igle?

A. Absence and performance would both come into play.

Q. Well, let me ask it again. As I understand, you told us absence and performance, did they come into play both for Mr. Igle and

Mr. Dias?
A. That would be everyone, everyone would be the same.
Q. Well, was it an issue? Would absences be an issue with either Mr. Dias or Mr. Igle?
MS. LaPORTE: Objection. Asked and answered.
MR. NOVACK: I don't think it has been.
MS. LaPORTE: It's been answered on several occasions.
MR. NOVACK: But I would like an answer.
THE WITNESS: Was it ever an issue?
MR. NOVACK: Yes.
THE WITNESS: Absence, to be honest I can't remember. I don't remember.
Q. BY MR. NOVACK: Was absence an issue regarding any person that was laid off at the same time Mr. Igle and Mr. Dias were laid off?
A. I don't recall.
Q. All right. Now, when you had to decide who to lay off, what was the process,





Mr. Silva? Did you have to -- did you do a list from the best to the worst or just take me through how you had to decide 12 people among 25. Did you have to rate them? How did you do it?
A. The support manager and myself, after I received the instructions from Mr. Bandy, support manager and myself we had to cut the work force down and we came up with the people that were the non-performers that we would have to lay off. There was no criteria as to who was best performers, who was the best non-performers and who was the worst non-performers.
Q. So you didn't say, you didn't say one person was better than another person?
A. No.
Q. Okay. At some point you kept 13 people and you laid off 12; correct?
A. I don't know the exact number. I would agree with you there though.
Q. Assume that's accurate. Now, how would you make a decision between the number 13th person that you would keep and the last person you would lay off? What was the criteria





there? How did you make the decision?
MS. LaPORTE: Objection.
THE WITNESS: I would base it on their performance. Again, it would be a discussion that I had with my two support managers.
Q. BY MR. NOVACK: Your impression you mean of their performance?
MS. LaPORTE: Objection.
THE WITNESS: Correct.
Q. BY MR. NOVACK: Because we said there were no records that you particularly used?
MS. LaPORTE: Objection.
THE WITNESS: Correct.
MS. LaPORTE: Asked and answered.
THE WITNESS: Correct.
Q. BY MR. NOVACK: Now, let me show you a document and ask you if you've ever seen it before?
A. Yes, I have.
Q. Would you identify it, please?
A. It's a reduction of work force guidelines from Wal-Mart.





MR. NOVACK: Could we mark it, please.
(Exhibit 2 was marked for identification.)
Q. BY MR. NOVACK: Exhibit Number 2, can you tell me when you first saw this document?
A. Mr. Bandy handed me a copy of that document and I was told to reduce the work force.
Q. So Mr. Bandy hands you a copy of this document?
A. Well, his office copy.
Q. Okay. And did Mr. Bandy tell you that this was the procedure to follow?
A. Correct.
Q. And did you follow this procedure?
A. As much as I can remember I did, yes.
Q. Now, there's a chart here attached to this, have you seen this chart before?
A. Yes.
Q. And was this a chart that you filled in when you did the reduction?
A. I believe the store manager had to fill this in. I'm not sure. I think the store

manager had to fill this in. Yeah, store manager must complete it on the top.
Q. Did you ever see it filled in?
A. No.
MR. NOVACK: Can we go off the record.
(Pause taken.)
MR. NOVACK: Back on the record.
Q. BY MR. NOVACK: Okay. Mr. Silva, let me ask you, you indicated that you followed this guideline that was given to you by Mr. Bandy as much as you could?
A. Correct.
Q. Okay. Were there areas that you couldn't or didn't follow that are set forth in this guideline here? Take a look at it.
A. I believe I tried to follow it as much as I could.
Q. All right. Let's go through it if we can. It indicates here that before conducting a reduction of work force, you should first ask for voluntary time off. Did you do that?
A. I believe I did.
Q. When you say you believe you did, you





might not have done it?
A. I believe I did ask for volunteers.
Q. And when would that have been?
A. That probably would have been the same time I was told that I had to reduce my work force.
Q. Did anyone volunteer?
A. No.
Q. Okay. Did you record anywhere that you did this, that you asked for volunteers and no one came forward?
A. I would have to pass it on verbally to Mr. Bandy but I wouldn't have to record it, no.
Q. Reduce peak time hours is the next step. What does that mean?
A. That doesn't pertain to overnight. This is a peak time, your busy times in a day.
Q. So that had no relevance to this particular thing?
A. Not overnights.
Q. Ensure everyone is working only their scheduled hours. What does that mean?
A. The schedule is printed up and it's posted three weeks in advance to make sure





everyone is following their schedule.
Q. Well, how would that help with regard to before you do a reduction?
A. If you have people that are working overtime, this is a way of getting rid of the overtime so you can keep as many of the employees that you can.
Q. Were people working overtime at the time of the reduction?
A. After Christmas I don't believe there was.
Q. Okay. Now, if those were not sufficient, you had to go to a reduction; is that correct?
A. Correct.
Q. And the first step that was indicated in the policy here was to release temporary associates, was that done?
A. Yes.
Q. Okay. And who was released as a temporary associate?
A. I can't remember names. I believe I released two people that were hired for the Christmas season.





Q. Do you recall whether they were black or white?
A. One was Rodney, he was a white gentleman that I had in pets, and I let Rodney go, and there was another gentleman that I believe was white, and I can't think of his name.
Q. Okay. So two white employees, two temporary white employees were let go?
A. Right.
Q. Okay. Now, terminate associates currently below evaluation who have not improved their performance to meet expectation. Were there any employees that were terminated because they had below evaluations?
A. Not that I can remember, no.
Q. And when they talk evaluations, we're talking about the performance appraisals, are we not, such as the one done in Exhibit Number 1; is that correct?
A. Correct.
Q. And can you tell us whether out of the 25 people in the, approximate 25 people in the overnight stocking crew, who if any had below

THE WITNESS: I don't believe he got a print out. No, I believe he wrote it down.

Q. BY MR. NOVACK: Did you ever see a list? Did Mr. Folder make a list?

A. Yes.

Q. Okay. And what was on that list?

A. As far as I can remember, it was the associate's name and the date of hire.

Q. Okay. And that would have been something like that was listed on Exhibit 2?

MS. LaPORTE: Objection.





THE WITNESS: No, I believe he just wrote it on a yellow pad.

Q. BY MR. NOVACK: Okay. And do you know where that yellow pad is now?

A. I have no idea.

Q. Was it submitted to the store manager?

A. I have no idea what he did with it.

Q. Okay. And where did you indicate that?

A. Here it is.

Q. You indicated that you had two temporary associates; correct?

A. To the best of my knowledge, yes.

Q. Okay. And we already agreed that you didn't look at who had below evaluations in making the decision; correct?

A. Correct.

Q. And did I ask you if any employees were terminated because of coaching?

MS. LaPORTE: Objection. Asked and answered. You can answer again.

THE WITNESS: When you asked me that, I had no recollection of it. It wasn't



layoffs were made on seniority basis.

MS. LaPORTE: Objection.

THE WITNESS: That's the way it should have been, correct.

Q. BY MR. NOVACK: So the intent was besides the temporary employees, to lay off by seniority; correct?

MS. LaPORTE: Objection.

THE WITNESS: Correct.

Q. BY MR. NOVACK: And that was the policy that you were told to do by the store manager?





A. Correct.

Q. Did you ever hear that some of the layoffs with regard to the overnight working crew were not made according to seniority, with the exception of the temporary employees?

A. Did I ever hear that?

Q. Yes.

A. No, I didn't.

Q. Okay. So when you say you followed this criteria, well, strike that. Let me ask you some other questions if I can here.

Can you tell me the racial composition of the overnight stocking crew prior to the layoffs?

A. I have no idea. I would have to look at the names.

Q. Okay. Could you tell me out of the 12, the 12 employees that were laid off -- you indicated that two of the temporaries were white -- with regard to the ten other employees that were laid off, what their racial composition was?

A. There again, I would have to look at